and American Honey Producers, 2024, 1370, and 71. Mr. Kendler. Thank you, Your Honor. May it please the Court, Ron Kendler of White and Case, on behalf of Plaintiffs' Appellants. Your Honors, this Court should remand the International Trade Commission Majority's Affirmative Critical Circumstances Determination regarding raw honey from Vietnam for two reasons. First, the Majority's determination was contrary to law. Second, the Majority's determination was unsupported by substantial evidence. Before we get started, there are a few dates to keep in mind. The filing of the anti-dumping petition in April 2021, the date of provisional measures in November 2021, and the issuance of the anti-dumping order in June 2022. It is that last date that is the focus of the critical circumstances analysis and of this appeal. First, as recognized by the dissent, the determination was contrary to law. This is clear from the plain language of the statute and the Majority's flawed analysis of subject import inventories. Now, there are two statutory provisions at issue in this case. The first is the General's critical circumstances provision, and the second is the inventory provision. The General's critical circumstances provision makes clear that the Commission must consider whether imports made within 90 days of the imposition of provisional measures, known as critical circumstances entries, are, quote, likely to undermine seriously the remedial effect of the anti-dumping duty order to be issued. This language makes clear that the Commission must conduct a forward-looking analysis, evident through the use of the term likely, which is inherently prospective, the phrase order to be issued, which requires the Commission to look forward to the issuance of the order, and reference to other statutory provisions concerning the issuance of the order at the end of the investigation. And this is crucial because the critical circumstances and its nature is extraordinary. It establishes anti-dumping liability three months earlier than normal and only in exigent circumstances, where imports are likely to undermine seriously the remedial effect of an order once issued. Indeed, between 2000 and 2022, when this order was issued, the Commission made only three affirmative critical circumstances determinations, despite over 70 allegations of such, three affirmative determinations in 22 years. The inventory provision requires the Commission to evaluate, quote, a rapid increase in inventories of the imports in its analysis. Now, the statute- Can I just interrupt? So this is the way I think I can understand what Judge Gordon said and I think the ITC said. So the point of this critical circumstances is to make sure that once there is an indication, namely the filing of an anti-dumping duty petition, that importers don't build up the stock before an anti-dumping duty starts applying. Not when the order is finally announced, but when it starts applying, which is at the suspension date. And so what you're interested in is figuring out whether there's been a, what you're interested in is a large rise between petition date and suspension date. And it doesn't have to stay in inventory because one way to hurt the domestic industry is to basically satiate the market so that consumers have all the honey they need for an extended period. Why doesn't that all just make straightforward sense under the statute so that the duty, in fact, these critical circumstances applies 90 days before the suspension date? Thank you, Judge Toronto. You are correct that there is this language about the imports coming in prior to the provisional measures, but the statute specifically instructs the commission to look at the inventory. So the inventories are relevant. And to your question, the key point about- I'm sorry. What is the language? I thought the language was increase, not the current level. Is that wrong? That is not wrong, Your Honor. But the notion of an increase takes into account current levels. And current levels- But it's not necessary, precisely because all of that could have been sold off. And so consumers are not going to buy anything from the domestics for a period, even though they're not in inventory of the importers of the imports. Respectfully, Your Honor, that is not the case. Because if the end users have bought it off and they've used it up, it is therefore not in inventory and it is not in the supply chain, and their demand will continue. And that's the key issue here, is that if the end users have used the honey, then it is not likely to seriously undermine the remedial effect of the order. I'm sorry. I just want to be clear. I thought the inventory was- let's just call it the importer's warehouse. Not off the top, but the importer's warehouse. We're not talking about whether consumers have used it up. Consumers may now have a full cupboard of honey, and so they're not going to go and buy domestic honey because they bought it all when they didn't have to indirectly pay the antidemesis. Thank you, Your Honor. Well, that goes to the heart of the issue of this case, is that there was evidence on the record showing that the importer's inventories had, in fact, declined and that it had been sold off to end users, and that the end users in the ordinary course of business do not keep inventory, were not stockpiling, and had consumed the honey. And at the point that they have consumed the honey, this goes back to the it is not likely to seriously undermine the remedial effect of the order. In fact, there's an affidavit of one honey packer at Appendix 31806, Mr. Chris Newburn, where he said that he continued to see demand from end users, and those end users do not keep the honey in inventory, thereby meaning that these inventories were not likely to seriously undermine the remedial effect of the order. So going to this issue of the inventories that we've discussed, the Commission had two data sets on the record. The first was importer inventories collected through its questionnaire responses, which ended eight months before the issuance of the order. And the other data set was submitted by importers and packers that ended three months before the issuance of the order. Now, the majority used only the questionnaire data, only what ended eight months before the issuance of the order, and that is a critical flaw, because first, when that analysis stops eight months before the issuance of the order, the Commission could not conduct the requisite statutory analysis of understanding the effect of these entries on the order at the time of issuance. Moreover, the importer and packer data submitted by the importers and packers demonstrated that, as we've just discussed, nearly all of the critical circumstances entries had been sold off, and that those end users were continuing to purchase, thereby demonstrating that they were not stockpiling this honey. And that's especially problematic, because entries that have been sold off and have been consumed, by definition, can not be in a position to seriously undermine the remedial effect of the order. And the importer and packer data did not, in fact, demonstrate, of course, that the end users had consumed it, but that's because the Commission did not request that data. And the importers and packers could not submit the confidential information of their own customers. They didn't have access to it. Now ‑‑ Yes, Your Honor, under our substantial evidence argument. Okay. And going back to kind of the statutory interpretation argument you're making, does your statutory interpretation argument require the timing and volume of the imports to be considered prior to the end of the investigation, or is the timing and volume of imports considered prior to suspension of liquidation? Thank you, Judge Cunningham. The timing and volume of the imports is a separate provision that we are not contesting the analysis of. We are solely contesting the Commission's interpretation of the likely to seriously undermine provision and the inventories provision. Why would there ever be a rapid increase in imports in the period before the investigation ends, rather than the period before the suspension of liquidation? Well, in this case, there was, in fact, and Mr. Newbern's testimony testifies to that. It can be like in this case where there, in fact, was a domestic shortage of honey and importers were willing to take on the burden of provisional measures in order to import because the market was That's just one hypothetical situation, which here, in fact, was not hypothetical. So coming back to this issue of seriously undermine, and the courts have spoken to this issue of the Commission refusing to develop the evidence. In Allegheny Ludlam, this court specifically stated that the Commission is obligated to make active, reasonable efforts to obtain relevant data. The Commission did no such thing here. It further stated that the Commission may not shirk this duty by asserting a failure of the parties to request that the Commission gather the data. And that's what exactly the Commission did here. Additionally, in Nippon Steel v. United States, the Court of International Trade explained that if the record lacks information necessary to show that a statutory requirement is satisfied, then there is no basis to issue a determination meeting that requirement. And here, the majority violated these principles, and that renders the determination contrary to law. The dissent of the Commission called this specific point out. As Commissioner Johansson, the dissenting Commissioner, stated, quote, the record contains clear evidence that the increase in imports was largely, if not entirely, eliminated in the next six months before the order. The record lacks evidence regarding final inventory levels. The statute permits an affirmative critical circumstances finding only if the imports subject to the determination likely will undermine seriously the order's remedial effect. Given the evidence in this record, I cannot find that this standard is met, end quote, and this Court should find the same. Moving on to the second point, as likewise recognized by the dissent, the determination was unsupported by substantial evidence. There are two key elements to the substantial evidence standard that are relevant here. First, the Commission must consider record evidence that supports an alternative conclusion. And second, speculation is not substantial evidence. Now, the key language from the majority's finding, evidentiarily speaking, is that it stated, quote, regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the postpetition period and is likely to place downward pressure on prices until it is consumed by end users. Now, substantial evidence did not support that conclusion, which is at Appendix 541. Now, first, the majority stated that these large volumes were likely in the supply chain. In other words, there was no evidence to establish the conclusion that the entries were in the supply chain rather than having been consumed by end users. The conclusion that the entries were in the supply chain is speculative. Second, the majority disregarded the inventory data submitted by importers and packers. And that inventory data showed that the inventories had fallen sharply well before three months of the issuance of the order and were at normal levels. Finally, the record did not support the allegations of stockpiling. Those issues are confidential, so I respectfully refer you to pages 41 to 44 of our brief. Plaintiffs' appellants respectfully request that this Court find the majority's affirmative critical circumstance determination contrary to law and unsupported by substantial evidence. I yield the rest of my time to rebuttal. Thank you, Your Honors. We will hold it for you. Mr. Holdenstein. Thank you, Your Honor. Michael Holdenstein for the International Trade Commission. May it please the Court. So critical circumstances is designed to deter importers from rushing in imports prior to suspension of liquidation. Once commerce finds a surge in imports, that is, massive imports over a relatively short period, the Commission is tasked with deciding whether those imports are likely to seriously undermine or immediately affect the order. Now, in making this determination, the Commission considered the statutory factors. There are only two factors mentioned in the statute, timing and volume of imports and the rapid increase in inventories. And both of those factors here are not challenged. There was an 83 percent increase in subject imports from Vietnam prior to suspension of liquidation compared to before the petition was filed. And the rapid increase also preceded the potential retroactive period for duties. In other words, they were frontloading the imports before the 90 days for which imports could be subject to retroactive duties. Imports peaked in August 2021, 90 days before suspension of liquidation. The inventories nearly tripled, and this was not explained by consumption patterns. The importers' shipments only increased by 2.8 percent, yet their inventories had tripled. The Commission also found that the industry was continuing to report Now, Sweet Harvest first raised this argument that the Commission was obligated to use 90 days for its analysis. It was only 90 days of imports the Commission should have considered. It never made this argument to the Commission. It only made it on appeal. The Commission considered six months' worth of imports. That was the entire period between the filing of the petition and suspension of liquidation. That's what Sweet Harvest argued for to the Commission. That's what petitioners agreed should be used. And that is what the Commission used. Now they say the Commission should have used 90 days. Now, that 90 days isn't in statute. It's not found in the SAA. It's only found in the suspension of liquidation provisions that apply once commerce is found. Critical circumstances. What is the best record evidence regarding the ITC's finding that the surge of imports was not for consumption? The best evidence of that is, first of all, the fact that the inventories tripled. That showed that they weren't for immediate consumption. The Commission also found that there was only a small increase in importers' shipments. So they weren't shipping out more honey. Those factors, as well as what's in footnote 305, that there was an inelastic demand for this product. It was sold at low prices, but that didn't mean there was going to be increased consumption of honey. So all of these factors indicated that the honey was likely not for immediate consumption. That's what the Commission found. Judge Gordon rejected the 90-day argument, saying it was inconsistent with the statute, the SAA, and the statutory scheme. His discussion is in the opinion of pages 13 to 15. Now, Sweet Harvest is also arguing that the effective date of the order was when the order was published. That's not accurate. The statute itself says that the order is effective as of suspension of liquidation. The Commission's provision says order to be issued under section 1673E. 1673E contains the general rule that makes final duties apply as of suspension of liquidation. Moreover, the orders themselves, as Judge Gordon found, say when are effective, and that's at suspension of liquidation for Argentina, Brazil, and India, and 90 days prior for Vietnam. So there's no merit to this argument that the date of issuance of the order has relevance here. So Sweet Harvest argues that all the inventories were sold off, but this argument is really based on a false premise that, as I've mentioned, that the order is effective when it's published. Really, the final duties are imposed as of suspension of liquidation. So even though the inventories were sold down, they were sold down during the period of relief after suspension of liquidation, and they were undermining the remedial relief, even though they were sold down. As I explained, the evidence also showed that they were not immediately consumed, and the Commission made that finding in response to the argument that even if they were sold off, it responded to that argument and said, even if they were sold off by the importers, that does not mean they were necessarily consumed. Sweet Harvest also mentioned an affidavit that says the Commission never addressed the claims in the affidavits that there was no stockpiling and that all the honey had been consumed, but the Commission did address the affidavit, and that's in footnote 306, appendix pages 541 to 542. There were no findings that all the honey had been consumed, and the dissent didn't find that all the honey had been consumed by the time of issuance of the order, and the Commission certainly didn't either. The discussion of this issue, whether the honey had all been consumed, is on the last two pages of the Sweet Harvest has also argued that the Commission made a finding that end users were stockpiling honey. The Commission didn't make that finding. It just said they were likely still in the supply chain. Sweet Harvest also argues the Commission should have gathered additional data, but again, this is an argument they never raised below. They never argued to the Commission it should gather any more data, and it abandoned this argument in the Court of National Trade, and you can see this in appendix page 23, footnote 5. They said they were no longer arguing for additional data. Sweet Harvest relies on Allegheny Ludlum. That case involved a situation where the Commission defined an additional like product, and then it said it couldn't gather data concerning material injury for the like product it had defined, but the Commission never sought to gather that data, even though it needed the data to address the statutory factors. Here, Sweet Harvest is arguing the Commission should have gathered data concerning declining inventories, and that's not a statutory factor. Again, the only statutory factor is the rapid increase in inventories prior to suspension or liquidation when the order is effective. Sweet Harvest also argues the Commission didn't do a forward-looking analysis. This isn't accurate. The Commission did a forward-looking analysis as of suspension of liquidation when the order was effective, and it looked at whether the imports and inventories prior to suspension of liquidation were likely to undermine the remedial effect of the order. The Commission examined the likelihood from this point in time, not just during the period after the order was published. Factors include the buildup in inventories and the continued underselling, and the Commission also found that the honey and inventory would continue to place downward pressure on prices, even though some of it had been sold off by the importers. The lower court also found that the Commission had conducted a forward-looking analysis, and you can see this in the appendix at page 30, which has the lower court's opinion. In conclusion, the Commission addressed the only two statutory factors, the rapid increase in inventories and the time of the volume of imports, and Sweet Harvest doesn't really contest those factors. Instead, it argues the Commission should have collected additional data that it never requested, and it makes arguments concerning the 90 days and the effective date of the order that were not even made to the ITC. They're contradicted by the SAA and the logic of the critical circumstances provision, which focuses on the period prior to suspension of liquidation. The lower court also rejected all these arguments. Sweet Harvest's factual arguments are based on findings not made by the Commission concerning end-user stockpiling, and it ignores the reasoning of the Commission concerning the declining inventories. For these reasons, Your Honor, the Commission respectfully requests that the court affirm the Commission's affirmative critical circumstances. Thank you, counsel. Thank you. We'll hear from the Pontiac Association. Ms. Brewer. Good morning. May it please the Court. This case is somewhat remarkable in that the appellants are not challenging that the three actual statutory factors listed under the factors to consider in this case were satisfied. They don't challenge the timing and volume of imports. Indeed, they were significant at nearly 87 percent. They don't challenge that there was a rapid increase in inventories of the imports during the six-month periods that were examined by the Commerce Department and by the Commission. That particular number is confidential, but it was stated publicly that it was nearly a three-fold increase when the comparison months were examined. And they don't contest that under the third provision that other circumstances indicated that the remedial effect of the order would be seriously undermined, and part of the Commission's analysis there was that rampant underselling by imports of raw honey from Vietnam continued throughout the investigation, even when prices began to rise for imports from other countries. None of that is contested. All appellants are asking is that the Court read the statute to include another requirement under the general provision that would basically be an escape hatch, that would operate such that even though the three factors to consider are satisfied, if inventories are undervalued, importers would not be subject to retroactive duties. And we respectfully submit that that is incorrect and not based on the plain meaning of the statute. I'd like to make two points in addition to the ones that counsel for the Commission made with respect to the statute, and then I have an additional substantial evidence point that I would like to add. The first is, if you look at the subsection B of 1673db4, which is the critical circumstances provision that applies to the Commission's analysis, you'll see that the term the imports is used three times, one under the general provision and one under the second provision factors to consider. Now again, appellants are not contesting the Commission's analysis under the second prong there, the factors to consider, which uses the term the imports two times. If you look back at the general provision, which states that the Commission shall include a finding as to whether the imports subject to the affirmative determination, et cetera, appellants are asking you to give different meaning to the term the imports in that part of the statute compared to the second, which under basic principles of statutory construction should not be done. If Congress had intended that that provision be interpreted more generally, it could have just said imports, but it said the imports. And in doing so, it referred back to subsection A3, which is the Commerce Department's affirmative substantive analysis. So stepping back, my second point is that if you look at the way that the statute is organized overall, and this is again focusing on 1673d, subsection A is the Commerce Department's affirmative. Subsection B is the Commission's substantive analysis. Are they going to go affirmative? If both of those provisions are satisfied and both agencies reach an affirmative determination, subsection C is called effective final determination. That's the only place where the 90 days is discussed, and it only goes into effect as the retroactive suspension of liquidation. So that's the proper way to read the statute to give it its SAA, which at page 876 states that if both agencies make affirmative determinations in their final investigations, retroactive duties will be applied for a period 90 days prior to suspension of liquidation. So again, the Commerce's substantive analysis under A and the Commission's substantive analysis under B are looking at the pool of imports prior to the suspension of liquidation. And those subsections, well, at least the Commission's subsection references Commerce's subsection so that those analyses are consistent. And the 90 days only comes into play as an effect of those affirmative findings and as the retroactive period for suspension of liquidation. So we would submit that the plain language of the statute does not support appellant's argument here. I would also note that, and counsel for the Commission made this point as well, during the underlying investigation, the appellants explicitly agreed to the use of six-month comparison periods for the Commission's critical circumstance analysis. This is cited in the Commission's views at appendix page 85, stating that all parties agreed to the use of the six-month periods. And it cited the appellants, the Packer Association appellants post-hearing brief. And I would urge the court to look at this confidential exhibit on the record. It's at appendix page 31-751 through 55. This is a response to a direct question by Commissioner Carpell at the hearing where she's asking about the timing of imports in the post-petition period and asking parties to comment on the Commission's critical circumstances analysis. In response to that question, appellants provided a four-page answer in which they adopt the use of the six-month comparison periods and say nothing about having to use a different time period under the statute for the gathering of information. I see I've gone over. I appreciate your time, Your Honors. I'd be happy to answer any questions and otherwise would urge the court to affirm the Commission's decision. Thank you, counsel. Mr. Kendler has some rebuttal time, about two-and-a-half minutes. Thank you, Your Honor. A few points on rebuttal and clarification. First, counsel, both the Commission and the petitioners have told you that we're misconstruing the term imports in the statute. We are doing no such thing. It is clear that those imports relate to the imports by reference to 1673AEA3, that those are the imports within the 90 days. And so those are the imports within the 90 days that come in and then are put into inventory. To that point, second, we are contesting the inventory provision. And that is the heart of this appeal. And it is perfectly logical that imports that come in 90 days before suspension of liquidation are then put in inventory. And at that point, when they are in inventory, they are likely to undermine seriously the remedial effect of the order. But that's not what happened here. Those imports did not stay in inventory. They were sold and they were consumed. And to that point, the record demonstrates that. The fact that the Commission ignored it and the Commission's counsel tells you today that it didn't does not undo that fact. The evidence was in the respondents' post-hearing briefs. To that point, counsel for the petitioners said that we agreed to the six-month period. If we agreed, then why did we submit additional inventory data in those briefs and ask the Commission to look at it? It simply does not hold water. The Commission also cited the decision of the Court of National Trade in that which it cited to the SAA in the statutory language. But we would refer you to pages 6 to 12 of our reply brief that demonstrates how both the Commission and the lower court have misconstrued the SAA, which uses various different terms, issue date, effective date, date of relief, date of the order. All of these terms have distinct meaning. If Congress wanted the effective date to be provisional circumstances or relief, it would have said so. It would have not said the date of the order to be issued. Furthermore, the Court of International Trade upheld the Commission on the basis of a Chevron Step 2 analysis. That analysis is no longer relevant, and the statutory language is clear. So it is clear that the Commission was required to conduct that prospective analysis. The Commission also tells us that the Commission did not rely on claims of stockpiling. That is not true. At Appendix 541 to 542 in the footnotes, they clearly reference the claims of stockpiling, which were factually misconstrued. This is demonstrated at pages 40 to 44 of our initial brief. With that, I rest my case. And again, we ask the Court to rule that the Commission's determination was both contrary to law and unsupported by substantial evidence. Thank you, Your Honors. Thank you to all counsel. We appreciate the arguments. The case is admitted.